UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION


JUDY STREITENBERGER,           )
                               )
        Plaintiff,             )
                               )
    v.                         )        No.  2:15 CV 71 JMB
                               )
NANCY A. BERRYHILL,[1]         )
Acting Commissioner of Social Security,  )
                               )
        Defendant.             )

## MEMORANDUM AND ORDER

This cause is on appeal from an adverse ruling of the Social Security Administration.  This

suit involves an Application for Disability Insurance Benefits.  The matter is fully briefed, and for

the reasons discussed below, the Commissioner's decision is affirmed.  All matters are pending

before the undersigned United States Magistrate Judge with consent of the parties, pursuant to 28

U.S.C. § 636(c).

## I.    Procedural History

On May 17, 2012, Plaintiff Judy Streitenberger ("Plaintiff") filed an Application for

Disability Insurance Benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr.

134-40).[2]  Plaintiff claimed that her disability began on January 28, 2012, as a result of back

---

[1]Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Rule 25(d)
of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting
Commissioner Carolyn W. Colvin as the defendant in this suit.  No further action needs to be
taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security
Act, 42 U.S.C. § 405(g).

[2]"Tr." refers to the page of the administrative record filed by the Defendant with her Answer
(ECF No. 12/filed December 17, 2015).

problems requiring lumbar fusion surgery. On initial consideration, the Social Security Administration denied Plaintiff's claims for benefits. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on March 10, 2014. (Tr. 27-68) Plaintiff testified and was represented by counsel. Vocational Expert Gary Weimholt also testified at the hearing. (Tr. 57-64, 101-03) Thereafter, on April 4, 2014, the ALJ issued a decision denying Plaintiff's claims for benefits. (Tr. 7-20) After considering the representative's brief and additional medical records, the Appeals Council found no basis for changing the ALJ's decision and denied Plaintiff's request for review on April 9, 2015. (Tr. 1-6, 290-94, 694-96)

Plaintiff filed the instant action on May 18, 2015. Plaintiff has exhausted her administrative remedies and the matter is properly before this Court. Plaintiff has been represented by counsel throughout all relevant proceedings.

In her initial brief to this Court, Plaintiff raises one issue - the ALJ erred in according little weight to her treating specialist, Dr. Jeffrey Parker. The Commissioner filed a detailed brief in opposition contending that the ALJ's decision is based upon substantial evidence. In her reply brief, Plaintiff argues that this case is analogous to Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir. 2015) ("Even if the [treating physician's] opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight.").

As explained below, the Court has considered the entire record in this matter. Because the decision of the Commissioner is supported by substantial evidence, it will be affirmed. The undersigned will first summarize the decision of the ALJ and the administrative record. Next, the undersigned will address the issue Plaintiff raises in this Court.

## II.     Decision of the ALJ

On April 4, 2014, the ALJ issued an adverse decision denying Plaintiff's request for DIB benefits.  The ALJ determined that Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2016.  (Tr. 12)  The ALJ acknowledged that the administrative framework required him to follow a five-step, sequential process in evaluating Plaintiff's claim.  (Tr. 11-12)  At step one, the ALJ concluded that Plaintiff had not engaged in any substantial gainful activity since January 28, 2012, the alleged onset date.  (Tr. 12)  At step two, the ALJ found Plaintiff had the following severe impairments during the relevant time period: degenerative disc disease of the lumbar spine requiring anterior lumbar fusion surgery, and a right wrist fracture requiring internal fixation surgery.  (Tr. 12-14)  The ALJ further concluded, however, that none of Plaintiff's impairments, either singly or in combination, significantly limited her ability to perform basic work-related activities for 12 consecutive months; therefore, Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  (Tr. 14)[3]

In making her Residual Functional Capacity ("RFC") determination, the ALJ found that Plaintiff has the capacity to perform less than a full range of light work to the extent the following nonexertional capabilities and limitations are included:  no twisting, stooping, or climbing of ladders; occasional crouching and climbing stairs; avoid concentrated exposure to fumes, odors, dusts, gasses, soldering fluxes, solvents, cleaners, and chemicals; avoid even moderate exposure to high humidity and vibration; avoid all exposure to temperature extremes; limited to frequent reaching, handling, and fingering with her right dominant upper extremity; and allowed a sit/stand

---

[3]The undersigned notes that the ALJ found that Plaintiff "through her attorney, did not assert that she met or medically equaled any of the listed impairments for her impairments."  (Tr. 14, 31)

option permitting for a change in position every thirty to sixty minutes for a few minutes while remaining at the workstation. The ALJ explained that the full range of light work involves lifting 20 pounds occasionally; lifting and/or carrying 10 pounds frequently; standing and/or walking and sitting 6 hours out of an eight-hour workday; and pushing and pulling at the same weight as lifting and carrying, but only occasionally. (Tr. 14)

The ALJ made an adverse credibility finding that no doubt influenced her RFC assessment. In particular, the ALJ found Plaintiff's "allegations of worsening pain and limitation of motion [in her lumbar spine and right wrist] not entirely credible. Instead, considering the evidence outlined above, including Plaintiff's increasing range of motion, normal gait, and lack of longitudinal weakness or sensory deficit, as well as the other factors discussed in this opinion, I find [Plaintiff] is capable of a range of light work...." (Tr. 16) The ALJ also found that Plaintiff's inconsistent hearing testimony, statements made during treatment, and the exertional activities in her function reports, as well as the reason she stopped working, diminished the credibility of her allegations overall. (Tr. 16-17)

The ALJ summarized her conclusions as follows:

> As to the other factors considered, [Plaintiff] made inconsistent statements that diminish the credibility of her allegations overall. At the hearing, she testified that she is limited to standing for fifteen minutes and walking no more than two blocks due to her pain. However, [Plaintiff] also testified that she is able to go grocery shopping and walk through the store for forty minutes at a time while pushing a cart. In May 2013, she admitted to her doctor that she was walking a mile every day for exercise.... These inconsistencies lead me to conclude that [Plaintiff's] allegations may not be entirely credible.

> [Plaintiff] did not stop working due to her medical conditions. In fact, she admitted that she was laid off for business related purposes. The fact that [Plaintiff] did not stop working due to her medical conditions leads me to wonder whether [Plaintiff] would have attempted to keep working but for her lay off. This is simply

one factor out of many that leads one to question the reasons for [Plaintiff's] continued unemployment.

[Plaintiff] reported significant limitations in exertional activities in her Function Reports.... However, her admissions at the hearing lead me to believe she is not as limited as alleged in the Function Reports.... For instance, [Plaintiff] testified that her daily energy level is good. She testified that she passes time during a typical day helping her mom and giving her insulin. She cooks things such as chicken and casseroles. She does laundry. She goes shopping at the grocery store. She pushes a cart while shopping. She carries her groceries. She is able to walk through the store for forty minutes. She is able to sit comfortably for 45 minutes at one time. Moreover, her admissions to her doctors leads one to believe she is capable of moderate daily exercise, walking up to a mile daily, and doing daily strengthening exercises.... The fact that [Plaintiff] can sit, stand, walk, lift, and carry in order to perform this range of daily activities suggests that she is not as limited as alleged....

(Tr. 16-17) (internal citations omitted).

Likewise, the ALJ found that Plaintiff's "symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone.... [The ALJ found] that [Plaintiff's] medically determinable impairments could reasonably be expected to cause some symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible...." (Tr. 15)

The ALJ summarized her conclusions regarding the weight given to the medical source statements of Plaintiff's treating orthopedist, Dr. Jeffrey Parker, as follows:

In his first statement, dated November 19, 2012, Dr. Parker limited [Plaintiff] to a substantially less than sedentary range of work during the fusion recovery process. ... In his second statement, dated February 14, 2014,[4] Dr. Parker again limited [Plaintiff] to less than a full range of sedentary work. I gave little weight to both opinions, as the treatment notes do not entirely support the restrictions Dr. Parker described in the medical source statement.... For instance, in October 2012, Dr. Parker noted that [Plaintiff] was doing well with relatively few complaints.... He remarked that [Plaintiff] had developed a good range of motion post-surgery and had normal

---

[4]The ALJ incorrectly noted the date Dr. Parker completed his second statement as February 14, 2014. The record shows that Dr. Parker's completed his second statement on February 27, 2014. (Tr. 635)

reflexes, sensation, and improved pain overall.... Treatment notes from May 2013 showed that [Plaintiff] walked with a normal gait. She did not have any reflex or sensory deficits.... Straight leg raise testing was negative.... She did not appear to have signs of weakness in her lower extremities.... Although [Plaintiff] complained of increased pain in November 2013, she reported that her pain medication was helping in January 2014 and physical examinations did not show any substantial signs of deterioration from prior visits.... Because these opinions are not entirely supported by treatment notes or objective findings, one cannot help but wonder whether Dr. Parker's opinion was influenced by other factors. For instance, the possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he sympathizes for one reason or another. Another reality, which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might satisfy their patients requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm these motives, they are more likely in situations where the opinion departs substantially from the rest of the evidence of record, as in the current case. With this in mind, I have given little weight to the multiple opinions of Dr. Parker.

I also considered the narrative opinion by Dr. Parker that [Plaintiff] may not be employable due to her wrist.... Dr. Parker was not treating [Plaintiff] in regards to her wrist. Moreover, treatment notes in regards to her wrist reveal that [Plaintiff] improved as the six-month mark after her surgery.... Therefore, Dr. Parker's opinion is not persuasive and has been given little weight.

(Tr. 17-18) (internal citations omitted)[5]

The ALJ found that Plaintiff is unable to perform any past relevant work. (Tr. 19) Based on testimony from the V.E., the ALJ further concluded that, considering Plaintiff's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy she could perform, including a cashier and an information clerk. (Tr. 19-20)

## III.   Evidence Before the ALJ

The administrative record in this matter includes voluminous medical records. Although

---

[5]In her brief to this Court, Plaintiff only challenges the ALJ's consideration of Dr. Parker's opinions. In addition to Dr. Parker, the ALJ also weighed the opinions of other sources. The ALJ gave great weight to Macia Lipski, M.D., a medical and vocational expert. The ALJ gave considerable weight to the examination of D. Joseph Mayer, M.D. Finally, the ALJ declined to give significant weight to the statements contained in third-party reports from two of Plaintiff's friends.

the Court has carefully considered all of the evidence in the administrative record in determining whether the Commissioner's adverse decision is supported by substantial evidence, only the records most relevant to the ALJ's decision and the issues raised by Plaintiff on this appeal are specifically discussed. The following is a summary of pertinent portions of the record.

## A. The Hearing Before the ALJ

The ALJ conducted a hearing on March 10, 2014. Plaintiff was present and represented by an attorney. Also present was a Vocational Expert Gary Weimholt ("VE").

### 1. Plaintiff's Testimony

Plaintiff testified primarily in response to questions posed by her attorney, with additional questions interjected by the ALJ. Plaintiff testified that she has not worked since she became disabled on January 28, 2012. (Tr. 32) At the time of her hearing, Plaintiff was fifty-two years old and lived in a trailer with her mother to help take care of her. Plaintiff testified that she graduated from high school. (Tr. 33, 52)

Plaintiff testified that her work history included assembly line jobs requiring her to lift between forty to fifty pounds, sixty times a day, five days a week. (Tr. 34, 36) While working as a house cleaner, she frequently lifted less than ten pounds and mopped and vacuumed floors. (Tr. 37) As a brake cable worker, Plaintiff lifted fifty pounds every hour. (Tr. 38)

Plaintiff testified that her lower back hurts when she bends over, and she has pain every day. (Tr. 38-39) Plaintiff reported that her energy level is good. After Plaintiff broke her right wrist, Dr. Todd Oliver performed surgical repair on April 28, 2013. Plaintiff testified she cannot bend her right hand backwards on the wrist, and she can only use her hand for fifteen minutes. (Tr. 42) Plaintiff explained that peeling potatoes and lifting five pounds are hard to do with her

right hand, and she has problems picking up small items.  (Tr. 43-44)  Plaintiff testified that she also had plantar fasciitis and neuromas in 2010.  (Tr. 54)

Plaintiff testified that she spends two hours a day lying down to alleviate her back pain. (Tr. 45)  Plaintiff's middle back pain prevents her from sleeping through the night.  (Tr. 46) During the day, Plaintiff helps her mother with her medications, cooks chicken and casseroles, does the laundry, and goes grocery shopping with a cart for forty minutes.  (Tr. 46-47)  Plaintiff testified that she can sit for forty-five minutes before she needs to stand or lie down, and she can stand for fifteen minutes and walk for two blocks before sitting down.  (Tr. 48)  Plaintiff testified that she is limited to lifting five pounds with her right hand and seven pounds with her left hand, and she lifts weights to strengthen her right hand.  (Tr. 48)  Plaintiff testified that she has problems standing and walking.  (Tr. 55)

Dr. Jeffrey Parker started treating Plaintiff in 2012 and performed back surgery in June 2012.  (Tr. 49)  Plaintiff testified that the back surgery did not help her but exercise has helped. (Tr. 50, 55)  Although Plaintiff has been advised to quit smoking to help her back heal, she is still smoking a pack of cigarettes each day.  (Tr. 56)

### 2.      Testimony of Vocational Expert Gary Weimholt

Vocational Expert Gary Weimholt ("VE") testified at the hearing.  The VE identified two jobs, a production assembler and a home care attendant, he considered to be Plaintiff's past relevant work.  (Tr. 57)

The ALJ asked the VE to assume someone similar to Plaintiff in age, education, and the same past work experience with the ability to perform work at the light range and capable of

lifting up to 20 pounds; frequent lifting, carrying up to 10 pounds; standing, walking

six hours out of an eight-hour workday; and sitting six hours out of an eight-hour workday; but no twisting, stooping or climbing ladders; occasional crouching or climbing stairs; pushing and pulling at the same weights but only occasional; avoid concentrated exposure to fumes, odors, dust, gases, soldering fluxes, solvents, cleaners and chemicals.

And the person should avoid moderate exposure to high humidity and vibration and avoid all exposure to temperature extremes. And the person is limited to frequent reaching, handling and fingering with the right dominant upper extremity. With just those limitations, any past work available?

(Tr. 59) The VE opined that such hypothetical individual could not perform Plaintiff's past relevant work. (Tr. 60) Even when the ALJ then specifically added no bending, the VE opined that the individual could not work as a small part assembler because of the constant reaching and handling required but such individual could work as a cashier or an information clerk. (Tr. 61-62)

Plaintiff's counsel posed a hypothetical with an individual of the same age, education, and work experience as Plaintiff and to assume that

they can lift ten pounds occasionally, less than ten pounds frequently, that they can stand and/or walk less than two hours during an eight-hour day; that they can sit less than two hours during an eight-hour day; that they can sit for 30 minutes before needing to change position; they can stand for 30 minutes before needing to stay in position; they must be able to walk around four times a day for at least 15 minutes; they do need the opportunity to shift at will from sitting to standing and/or walking during the day.

I want you to assume that the hypothetical individual will at least twice each day need the opportunity to lie down at unpredicted – unpredictable intervals during an eight-hour work shift. They many never twist; never bend or stoop; occasionally crouch; occasionally climb stairs; never climb ladders. Reaching, handling, fingering and feeling are limited to constantly; pushing and pulling limited to occasionally.
They should avoid all exposure to extreme cold and heat. They should avoid moderate exposure to high humidity. They should avoid concentrated exposure to fumes, odors, dusts and gases, soldering fluxes, solvents and cleaners and chemicals. They can be around perfume.

The hypothetical individual would be absent about – well, more than four days per month, more than four days per month. And the hypothetical individual is likely to

- 9 -

be off task 25 percent or more of the time. In addition, the hypothetical individual will need to take unscheduled breaks three to four times a day of up to 15 minutes. Would there be any jobs in the national economy such an individual could perform?

(Tr. 63-64) The VE opined that there would not be any jobs in the national economy such individual could perform because of the number of hours worked, the excessive absenteeism, and the time off schedule would be unproductive. (Tr. 64)

Next, the ALJ asked the VE if the jobs he listed in response to the first hypothetical would still be available if there is a sit/stand option included, allowing a change of position every thirty to sixty minutes for a few minutes while remaining at the work station. (Tr. 65) The VE noted that there would be a reduced number of cashiering jobs that would allow for intermittent sitting/standing but the number of information clerk jobs would not change. (Tr. 67)

### B.     **Forms Completed by Plaintiff**

In the Disability Report - Adult, Plaintiff reported that she stopped working because she was laid off and her conditions. (Tr. 204)

In her Function Report - Adult, completed on June 4, 2012, Plaintiff listed doing housework, helping her mother, cooking supper, and doing laundry and shopping as her daily activities. (Tr. 233) Plaintiff reported shopping for food and clothes once a week. Every week Plaintiff goes to church, sports events, social groups, the park, and to the lake. (Tr. 237)

In her Function Report - Adult, completed on August 30, 2012, Plaintiff reported trying to do work around the house and then going on a walk.

### C.     **Medical Records and Source Opinion Evidence**

#### 1.     **General History**

The medical evidence in the record shows that Plaintiff has a history of chronic back pain,

right wrist fracture, severe degenerative disc disease at L4-5 with a right disc protrusion, lumbar spondylosis,[6] and lumbar spinal stenosis.[7] (Tr. 297-696) Although the Court has carefully considered all of the evidence in the administrative record in determining whether the Commissioner's adverse decision is supported by substantial evidence, only the medical records relevant to the ALJ's decision and the issues raised by Plaintiff on this appeal are discussed.

The relevant medical evidence will be discussed in more detail below, as part of the Court's analysis of the arguments raised by Plaintiff herein.

> ### 2. Columbia Orthopaedic Group - Drs. Jeffrey Parker, Timothy Crislip and Todd Oliver (Tr. 228-45, 417-34, 443-76, 478-82, 632-42, 675-78)

> #### a. *Dr. Jeffrey Parker*

Between August 30, 2010, and July 15, 2013, Dr. Jeffrey Parker, a doctor at Columbia Orthopaedic Group, treated Plaintiff for low back pain, lumbar spondylosis, lumbar spinal stenosis, and severe degenerative disc disease at L4-5.

During treatment on August 30, 2010, Dr. Parker observed that Plaintiff walked with a normal gait and was able to heel and toe walk without difficulty. Examination of Plaintiff's lumbar spine showed tenderness over her lumbar paraspinals and a full active range of motion. An x-ray revealed mild degenerative scoliosis but no severe degenerative changes. Dr. Parker ordered an MRI. On January 19, 2011, Plaintiff returned for follow-up treatment. Examination showed mild limitation of motion and tenderness. An MRI of Plaintiff's lumbar spine revealed a right paracentral disc protrusion at L4-5 with mild facet changes. Plaintiff complained of low

---

[6]Spondylosis is defined as an inflammation of one or more of the vertebral bodies. Stedman's Medical Dictionary at 1813 (28th ed. 2006).

[7]Stenosis is defined as a narrowing of any canal. Stedman's at 1832.

back and right lower extremity. Dr. Parker recommended epidural and lumbar facet blocks.

On January 21, 2011, Dr. Parker administered an epidural steroid injection. In follow-up treatment on February 16, 2011, Plaintiff reported improvement of her back pain after the injection and only occasional right leg pain. Plaintiff indicated that she can live with her present level of pain and discomfort as long as she takes Tramadol. Examination showed Plaintiff's back was nontender and had a full range of motion. Dr. Parker diagnosed Plaintiff with severe degenerative disc disease at L5-S1, with a right sided disc protrusion with right lateral recess stenosis. Dr. Parker refilled Plaintiff's Tramadol prescription and recommended a home program for trunk strengthening.

On March 24 and April 6, 2011, Dr. Parker administered lumbar epidural steroid injections. Plaintiff reported still having back pain, but after the injections, the pain was better. Examination showed Plaintiff's back was nontender, and she had a mild limitation of motion. In a Return to Activity Form, Dr. Parker indicated that Plaintiff was able to return to work without restrictions.

In follow-up treatment on November 28, 2011, Plaintiff reported continued back pain. Examination showed Plaintiff was fully ambulatory, and she had full lumbar motion with pain. Dr. Parker explained that Plaintiff's only option would be to have surgery but she wanted to wait. Dr. Parker scheduled follow-up treatment in six months and noted that Plaintiff would need to stop smoking before surgery.

When Plaintiff returned on April 18, 2012, she reported continued back pain and also pain in her right leg. Plaintiff requested scheduling surgery because she could no longer live with her present level of pain and discomfort. An MRI of Plaintiff's lumbar spine showed a disc protrusion

at L4-5 and stenosis and a minimal disc bulge at L3-L4.

On May 9, 2012, Plaintiff reported that her back pain had become unmanageable. Examination showed severe pain with motion and limited flexion and extension of her back. Dr. Parker recommend performing fusion surgery at L4-5 and L5-S1. Dr. Parker encouraged Plaintiff to stop smoking prior to surgery.

On June 26, 2012, Dr. Parker performed interbody fixation surgery at L4-5 and L5-S1. On June 29, 2012, Plaintiff was discharged and ambulating wearing a corset.

In a post-operative visit on July 11, 2012, Plaintiff reported doing fine and having no problems. Dr. Parker noted that Plaintiff's pain was much better. Examination showed Plaintiff's back was nontender, and she was able to heel and toe stand. Dr. Parker instructed Plaintiff to continue her walking program. On August 22, 2012, Plaintiff reported doing fine, having no problems, and walking a mile a day. Examination of Plaintiff's back showed a good range of motion. Dr. Parker instructed Plaintiff to continue her walking program, to stop smoking, to discontinue wearing her back brace, and to avoid any heavy lifting.

In follow-up treatment on October 22, 2012, Plaintiff reported doing fairly well but she still had a lot of back pain at times. Examination showed no back tenderness and a good range of motion with no neurological deficits. Dr. Parker prescribed Tramadol.

In response to counsel's request, Dr. Parker provided his medical opinion regarding Plaintiff's medical condition and the impact of her conditions on her ability to work on October 22, 2012. Dr. Parker listed lumbar spondylosis at L4-5 and L5-S1 as Plaintiff's medical condition. Dr. Parker noted that Plaintiff was currently recovering from spinal fusion surgery, and she would require physical therapy in the future as the fusion heals. Dr. Parker opined that

Plaintiff's functional improvement would include improved lumbar range of motion and less pain with activities of daily living. Dr. Parker also opined that at the current time, Plaintiff could not engage in competitive employment due to recent surgery. Dr. Parker found Plaintiff could not bend, crawl, or stoop but she could sit or stand for two hours in an eight hour workday.

On November 19, 2012, Dr. Parker completed a Physical Residual Functional Capacity Assessment ("PRFCA") in which he opined that due to her back condition, Plaintiff could only lift up to ten pounds occasionally; stand and/or walk less than two hours in an eight-hour workday; and sit less than six hours in an eight-hour workday. Dr. Parker further found that Plaintiff could occasionally climb and balance, but she could never stoop, kneel, crouch, or crawl. Dr. Parker further limited Plaintiff's ability to reach and found she needed to avoid extreme cold and heat, wetness, humidity, vibration, and hazards such as machinery and heights.

Plaintiff returned for follow-up treatment on February 20, 2013, and reported not having any major issues and her back and legs doing fairly well. Examination showed no tenderness in her back and a good range of motion. Dr. Parker noted that "[i]t really looks like she is doing very well and we will have her keep doing her walking program." (Tr. 481/642)

On July 15, 2013, Plaintiff returned for her one-year check up of her fusion surgery. Plaintiff reported pain, stiffness, and an inability to bend over. Examination showed back tenderness and mild limitation of motion. Dr. Parker opined that Plaintiff has some mild chronic low back pain and questioned whether Plaintiff was employable due to her wrist fracture. Dr. Parker instructed Plaintiff to stay as active as possible, to call if she has any progressive symptoms, and to return in one year.

Dr. Parker completed a Medical Source Statement of Ability to Do Work-Related

Activities (Physical) ("MSS") on February 27, 2014. Dr. Parker found Plaintiff could lift/carry ten pounds occasionally and less than ten pounds frequently; sit or stand for less than two hours in a workday; must walk around four times in an eight hour workday for fifteen minutes; and must lie down twice a day at unpredictable intervals during an eight hour workday. As to postural limitations, Dr. Parker found Plaintiff can never twist, stoop/bend, or climb ladders and can occasionally climb stairs and ladders. In support, Dr. Parker cited how Plaintiff's extensive lumbar fusion limits Plaintiff due to pain and stiffness. Dr. Parker further found a manipulative limitation of occasionally pushing and pulling. In support, Dr. Parker cited how Plaintiff's back pain and stiffness would prevent her from doing any significant pushing/pulling during employment. As to environmental restrictions, Dr. Parker found Plaintiff must avoid exposure to extreme cold and heat and avoid concentrated exposure to soldering fluxes, solvents/cleaner, chemicals, and fumes, odors, dusts, gases. Dr. Parker opined that Plaintiff's impairments would cause Plaintiff to miss work more than four days each month, and she would have take three to four unscheduled breaks fifteen minutes in duration. Dr. Parker further opined that Plaintiff would be off task at least twenty-five percent of a typical workday.

### b.    *Dr. Timothy Crislip*

Between January 23 and August 5, 2013, Dr. Timothy Crislip treated Plaintiff's right forefoot and plantar heel pain.

On January 23, 2013, Dr. Timothy Crislip evaluated Plaintiff's right forefoot and plantar heel pain. Plaintiff reported being unemployed and doing moderate exercise. Dr. Crislip diagnosed Plaintiff with a right neuroma and plantar fasciitis. Dr. Crislip injected Plaintiff's foot with lidocaine, Kenalog, and Depo-Medrol and prescribed a night splint and stretching regimen.

Plaintiff returned on February 21, 2013, for a recheck, and reported her heel pain much improved and her neuromas doing a little better. Dr. Crislip injected her joint and neuroma.

Plaintiff returned on March 21, 2013, for follow-up treatment and reported her neuroma and plantar fasciitis were doing well after the injection Dr. Crislip administered during her last visit. On April 25, 2013, Plaintiff reported a reoccurrence of the pain from her neuroma and requested an injection in the area. Dr. Crislip administered an injection. In follow-up treatment on August 5, 2013, Plaintiff reported doing the motion therapy on her own and feeling like it is coming along but having some stiffness and soreness. Examination showed some tenderness and some improvement. Dr. Crislip encouraged Plaintiff to be aggressive with her exercises on a continued basis.

### c.   *Dr. Todd Oliver*

Between April 29 and November 5, 2013, Dr. Todd Oliver, a doctor at Columbia Orthopaedic Group, treated Plaintiff for her right wrist fracture.

On April 29, 2013, Dr. Oliver surgically repaired Plaintiff's right distal fracture she sustained after a fall. On May 6, 2013, Plaintiff returned complaining of significant swelling at the operative site and numbness of her small finger on her right hand. Dr. Oliver removed her postoperative splint, and Plaintiff reported improvement in the numbness. Dr. Oliver placed Plaintiff in cast to allow Plaintiff better movement of her fingers. In follow-up treatment on May 13, 2013, Dr. Oliver noted that Plaintiff could gently flex and extend all digits. In follow-up treatment on May 22, 2013, Plaintiff complained of continued problems with her cast and requested a removable splint. Dr. Oliver noted some swelling of Plaintiff's fingers, and Plaintiff able to flex and extend all digits. Dr. Oliver restricted Plaintiff to no lifting, pushing, or pulling.

During treatment on June 3, 2013, Dr. Oliver restricted Plaintiff to light activities of daily living and no lifting, pushing, or pulling. On July 3, 2013, Dr. Oliver discontinued Plaintiff's use of the brace and instructed Plaintiff to continue with aggressive therapy.

On November 5, 2013, Plaintiff reported doing better and continuing to make improvement. Examination showed Plaintiff lacked some extension on the right compared to the other side, but her wrists were completely symmetric, and she had decent flexion. Although Plaintiff lacked some extension as compared to the other side, Dr. Oliver noted that Plaintiff had good pronation, supination, and radial and unlar deviation. Dr. Oliver noted that Plaintiff would continue to improve ever further with strengthening exercises over the next several months and requested Plaintiff return if she experienced any significant problems.

### d. *Dr. Jennifer Clark*

During a bone health evaluation on May 13, 2013, Plaintiff reported having had back surgery in 2012 and having reasonably good activity tolerance, no significant limitations, walking a mile every day, and using no assistive devices to ambulate. Dr. Clark noted Plaintiff had a normal gait without any sensory or motor deficits, and Dr. Clark found that Plaintiff had no significant limitations due to her back condition.

### 3. __Columbia Interventional Pain Center - Dr. D. Joseph Meyer__ (Tr. 435-42, 680-87)

On May 1, 2012, Dr. D. Joseph Meyer conducted lumbar discography studies. Plaintiff reported having a two-year history of low back pain with pain radiating down her right lower extremity with no relief from epidural steroid injections. Plaintiff reported that she retired on January 28, 2012. Dr. Meyer observed Plaintiff had a normal gait and was able to heel walk. The

studies showed evidence of disc sensitivity at the L4-5 and L5-S1 levels. Dr. Meyer diagnosed Plaintiff with degeneration of lumbar disc, low back pain, spondylolisthesis, and right extremity pain. An discography revealed positive pain at L4-5 and L5-S1.

On September 4, 2013, Plaintiff returned to the clinic "at the urging of her lawyer in order to pursue evaluation so that she can undergo proceedings to obtain disability." (Tr. 680) Plaintiff reported that the June 26, 2012, fusion surgery improved her low back pain but that she still experienced some degree of pain in the same area of her lower back. Plaintiff explained that the pain worsens when she remains in any position too long, including sitting and standing. Plaintiff reported walking for exercise, and she had good results after operative repair of her fractured wrist. Plaintiff reported being a retired factory worker. Dr. Meyer noted that an April 18, 2012, MRI scan of Plaintiff's lumbar spine showed evidence of moderate disc dehydration and a moderate-sized midline disc protrusion at the L4-L5 level as well as foraminal narrowing at L4–S and effacement of the descending right L5 nerve root. Examination showed a normal range of motion of Plaintiff's back, a normal gait, no sensory or motor deficits, and no signs of weaknesses in her lower extremities.

Dr. Meyer observed that Plaintiff could easily stand up from a chair, and her balance, gait, and heel walk and tiptoe abilities were all normal. Examination showed a normal range of motion of her spine, and straight leg raises were negative. Dr. Meyer further found that Plaintiff had no sensory or motor deficits and no signs of weakness in her lower extremities based on his examination. Dr. Meyer opined that Plaintiff still experienced some degree of pain in the lumbosacral junction with prolonged sitting or standing. Dr. Meyer found Plaintiff's chronic pain condition was fairly stable and only mild to moderate in severity. Dr. Meyer encouraged Plaintiff

"instead of 'persuing[*sic*] disability,'" she should "persue[*sic*] active improvement of her overall situation" by starting physical therapy as prescribed and changing her medication regimen. (Tr. 684) Dr. Meyer also noted that although Plaintiff reported seeing a number of primary care physicians over the past few years, Plaintiff indicated that she did not have a primary care physician and could not explain why.

### 4.      <u>Moberly Medical Clinics - Dr. Jon Rampton</u> (Tr. 581-98)

On June 21, 2013, Plaintiff presented to establish care at Moberly Medical Clinics with Dr. Jon Rampton as her primary care physician. During treatment on June 25 and July 9, 2013, Plaintiff reported no exercise intolerance. Dr. Rampton observed Plaintiff to ambulate normally.

### 5.      <u>Samaritan Hospital</u> (Tr. 297-308)

On October 30, 2010, Plaintiff received treatment for chronic back pain in the emergency room at Samaritan Hospital. An x-ray of Plaintiff's lumbar spine showed scoliosis.

### 6.      <u>Boone Hospital Center</u> (Tr. 322-37, 351-403, 484-580)

A CT scan of Plaintiff's lumbar spine on May 1, 2012, showed central disk herniation at 4-5 with spondylotic change resulting in mild stenosis, and a disk bulge at 5-1.

On June 26, 2012, Dr. Parker performed surgery, anterior lumbar fusion at L4-5 and L5-S1 at Boone Hospital Center. Plaintiff was discharged on June 29, 2012, and scheduled for follow-up treatment.

On April 29, 2013, Dr. Todd Oliver performed surgery, an open reduction internal fixation after Plaintiff fractured her right wrist. Dr. Oliver instructed Plaintiff to wear a splint and not to lift anything with her right upper extremity.

### 7.      <u>Columbia Surgical Associates - Dr. John Adams</u> (Tr. 343-47)

On June 15, 2012, on referral by Dr. Parker, Dr. John Adams treated Plaintiff's degenerative disc disease at L4-5 and L5 and S1. Dr. Adams recommended surgical repair.

### 8. **Total Family Healthcare - Dr. Bradley Freidel** (Tr. 617-25, 695-96)

On November 25, 2013, Plaintiff presented to establish care at Total Family Healthcare with Dr. Bradley Freidel after Drs. Oliver and Parker released her from treatment and recommended that Plaintiff establish treatment with a primary care physician. Plaintiff complained of low back pain for the prior two years with improvement after surgical repair until one month earlier, when the pain returned. Plaintiff reported having intermittent low back pain and having retained a lawyer to seek disability. Plaintiff expressed feelings of depression. Dr. Freidel prescribed Tramadol and Cymbalta. Plaintiff returned on January 2, 2014, and reported prescribed medications helping. Dr. Freidel continued Plaintiff's medication regimen. On February 11, 2014, Plaintiff reported Tramadol prescribed by Dr. Wolkowitz[8] helping her back pain and the increased dosage of Cymbalta helping her chronic pain.

## IV. **Standard of Review and Analytical Framework**

To be eligible for Disability Insurance Benefits ("DIB"), Plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). Additionally, a claimant will be found to have a

---

[8]The undersigned notes that record does not contain any treatment notes from Dr. Wolkowitz.

disability "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment, she is not eligible for disability benefits. If the claimant has a severe impairment, the ALJ proceeds to step three and determines whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed, or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed, or is not the equivalent of a listed impairment, the ALJ proceeds to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five to determine whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be

found disabled.  20 C.F.R. § 404.1520(f); <u>see</u> <u>also</u> <u>Bowen</u>, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." <u>Pearsall</u>, 274 F.3d at 1217.  Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." <u>Id.</u>  The Court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." <u>Beckley v. Apfel</u>, 152 F.3d 1056, 1059 (8th Cir. 1998).  The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion.  <u>Haley v. Massanari</u>, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The claimant's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the claimant's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## V.    **Analysis of Issue Presented**[9]

In her brief before this Court, Plaintiff contends that the ALJ committed reversible error when the ALJ accorded little weight to her treating specialist, Dr. Jeffrey Parker.[10] As explained below, the Court finds the ALJ did not err in articulating her reasoning in giving little weight to the opinions of Dr. Parker. Accordingly, substantial evidence in the record as a whole supports the ALJ's decision that Plaintiff is not disabled within the meaning of the Act.

---

[9]The Court notes that Plaintiff does not challenge the ALJ's adverse credibility determination in her Briefs. Moreover, the Court finds the ALJ complied with the strictures of Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), and there is substantial evidence in the record to support the ALJ's analysis of Plaintiff's credibility. A review of the ALJ's decision shows she discredited Plaintiff's subjective complaints for good reason and thoroughly discussed the medical evidence of record and inconsistencies in the record, Plaintiff's activities of daily living, and her reason to stop working not due to her medical conditions, in support of her adverse credibility determination.

[10]In her Reply Brief, Plaintiff asserts that she underwent two back surgeries. Although the undersigned agrees that Plaintiff had two surgeries, both were not back surgeries. The medical record shows that Dr. Parker performed a lumbar interbody fusion surgery on June 26, 2012, and Dr. Oliver surgically repaired Plaintiff's right distal fracture on April 29, 2013. (Tr. 343-46, 444-55, 533-38)

Plaintiff contends that the ALJ failed to provide good reasons for affording little weight to Dr. Parker's four page Medical Source Statement of Ability to Do Work-Related Activities (Physical) ("MSS"), dated February 27, 2014, setting forth his opinions as to Plaintiff's inability to perform work even at the sedentary level. In relevant part, Dr. Parker found Plaintiff could lift/carry ten pounds occasionally and less than ten pounds frequently; sit or stand for less than two hours in a workday; must walk around four times in an eight hour workday for fifteen minutes; and must lie down twice a day at unpredictable intervals during an eight hour workday. As to postural limitations, Dr. Parker found Plaintiff can never twist, stoop/bend, or climb ladders and can occasionally climb stairs and ladders. In support, Dr. Parker cited how Plaintiff's extensive lumbar fusion limits Plaintiff due to pain and stiffness. Dr. Parker further found a manipulative limitation of occasionally pushing and pulling. In support, Dr. Parker cited how Plaintiff's back pain and stiffness would prevent her from doing any significant pushing/pulling during employment. As to environmental restrictions, Dr. Parker found Plaintiff must avoid exposure to extreme cold and heat and avoid concentrated exposure to soldering fluxes, solvents/cleaner, chemicals, and fumes, odors, dusts, gases. Dr. Parker opined that Plaintiff's impairments would cause Plaintiff to miss work more than four days each month, and she would have take three to four unscheduled breaks, each fifteen minutes in duration. Dr. Parker further opined that Plaintiff would be off task at least twenty-five percent of a typical workday.

Opinions from medical sources who have treated a claimant typically receive more weight than opinions from one-time examiners or non-examining sources. See 20 C.F.R. § 416.927(c)(1)-(2). However, the rule is not absolute; a treating physician's opinion may be disregarded in favor of other opinions if it does not find support in the record. See Casey v.

Astrue, 503 F.3d 687, 692 (8th Cir. 2007). The treating physician's opinion should be given controlling weight when it is supported by medically acceptable laboratory and diagnostic techniques and it must be consistent with other substantial evidence in the case record. Hacker v. Barnhart, 459 F.3d 935, 937 (8th Cir. 2006). See also 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (listing '[s]upportability" as a factor to be considered when weighing medical opinions). Inconsistencies may diminish or eliminate weight given to opinions. Hacker, 459 F.3d at 937. See also Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir. 2015) (holding that a treating physician's opinion "may have 'limited weight if it provides conclusory statements only, or inconsistent with the record'") (quoting Samons v. Astrue, 497 F.3d 813, 818 (8th Cir. 2007)). An ALJ "may discount or even disregard the opinion ... where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermines the credibility of such opinions." Id. (quoting Miller v. Colvin, 784 F.3d 472, 477 (8th Cir. 2015)).

        If an ALJ declines to ascribe controlling weight to the treating physician's opinion, she must consider the following factors in determining the appropriate weight: length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization. 20 C.F.R. §§ 404.1527(c); 416.927(c). Whether the ALJ grants the treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005). "Failure to provide good reasons for discrediting a treating physician's opinion is a ground for remand." Reed v. Barnhart, 399

F.Supp.2d 1187, 1194 (E.D. Mo. 2004).

The ALJ summarized her analysis regarding Dr. Parker's opinions as follows:

> I gave little weight to both opinions, as the treatment notes do not entirely support the restrictions Dr. Parker described in the medical source statement.... For instance, in October 2012, Dr. Parker noted that [Plaintiff] was doing well with relatively few complaints.... He remarked that [Plaintiff] had developed a good range of motion post-surgery and had normal reflexes, sensation, and improved pain overall.... Treatment notes from May 2013 showed that [Plaintiff] walked with a normal gait. She did not have any reflex or sensory deficits.... Straight leg raise testing was negative.... She did not appear to have signs of weakness in her lower extremities.... Although [Plaintiff] complained of increased pain in November 2013, she reported that her pain medication was helping in January 2014 and physical examinations did not show any substantial signs of deterioration from prior visits.... Because these opinions are not entirely supported by treatment notes or objective findings, one cannot help but wonder whether Dr. Parker's opinion was influenced by other factors. For instance, the possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he sympathizes for one reason or another. Another reality, which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might satisfy their patients requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm these motives, they are more likely in situations where the opinion departs substantially from the rest of the evidence of record, as in the current case. With this in mind, I have given little weight to the multiple opinions of Dr. Parker.

(Tr. 17-18) (internal citations omitted).

The ALJ determined that Dr. Parker's opinions in the February 27, 2014, MSS were not entitled to controlling weight because his opinions were inconsistent with his own clinical treatment notes. "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) (rejecting challenge to lack of weight given treating physician's opinion where the physician renders inconsistent opinions that undermine the credibility of such opinions).; see also Clevenger v. S.S.A., 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow

opinion of treating physician that was not corroborated by treatment notes).

The ALJ acknowledged that Dr. Parker was Plaintiff's treating orthopedist. The record shows Dr. Parker treated Plaintiff on fourteen occasions from August 30, 2010, through July 15, 2013, nine times before her surgery on June 26, 2012, and five times after the surgery. During treatment on February 20, 2013, Plaintiff reported not having any major issues and her back. Dr. Parker noted that "[i]t really looks like she is doing very well and we will have her keep doing her walking program." (Tr. 481/642)

Dr. Parker last treated Plaintiff on July 15, 2013, seven months before completing the MSS, and Plaintiff did not report the conditions and symptoms that she claims render her totally disabled. Plaintiff reported pain, stiffness, and an inability to bend over, and examination showed back tenderness and mild limitation of motion. Dr. Parker opined that Plaintiff has some mild chronic low back pain and questioned whether Plaintiff was employable due to her wrist fracture.[11] Dr. Parker instructed Plaintiff to stay as active as possible, to call if she has any progressive symptoms, and to return in one year. When Plaintiff presented on November 25, 2013, to establish care with a primary care physician, Dr. Freidel, Plaintiff reported Dr. Parker had released her from his care.

Dr. Parker's treatment records do not support the limitations set forth in the February 27, 2014, MSS inasmuch as he never found similar physical and functional limitations during his

_____

[11]The ALJ afforded Dr. Parker's narrative opinion regarding Plaintiff's right wrist fracture little weight, noting that Dr. Parker did not treat Plaintiff for her wrist fracture, and Dr. Parker's opinion was inconsistent with and unsupported by the medical evidence of record. Dr. Oliver treated Plaintiff's wrist fracture and performed the surgical repair, and Dr. Oliver found that Plaintiff's condition would continue to improve with exercise over the next several months. Further, Plaintiff did not allege her wrist fracture to be a disabling impairment in her application for benefits.

course of treatment of Plaintiff. See Anderson v. Astrue, 696 F.3d 790, 794 (8th Cir. 2012)

(affirming ALJ's rejection of treating physician's opinions about claimant's exertional limitations

that "[were] not reflected in any treatment notes or medical records); Papesh, 786 F.3d at 1132

(an ALJ may discount or even disregard the opinion where a treating physician renders

inconsistent opinions that undermine the credibility of such opinions). It is significant that no

examination notes accompanied the MSS, and by that time Plaintiff had been released from Dr.

Parker's treatment. Further, the MSS appears to have been procured by, and submitted to,

Plaintiff's counsel.

The ALJ also found that Dr. Parker's opinions in the February 27, 2014, MSS were not

entitled to controlling weight because they were inconsistent with the objective medical evidence

in the record. See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion

is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less

weight."). After examining Plaintiff on September 4, 2013, Dr. Meyer noted Plaintiff had a

normal range of motion of her back, a normal gait, no sensory or motor deficits, straight leg raises

were negative and no signs of weaknesses in her lower extremities. Dr. Meyer observed that

Plaintiff could easily stand up from a chair, and her balance, gait, and heel walk and tiptoe abilities

were all normal. Plaintiff reported that the fusion surgery improved her low back pain. When

Plaintiff returned to the clinic "at the urging of her lawyer in order to pursue evaluation so that

she can undergo proceedings to obtain disability," Dr. Meyer further found that Plaintiff had no

sensory or motor deficits and no signs of weakness in her lower extremities based on his

examination, and found Plaintiff's chronic pain condition was fairly stable and only mild to

moderate in severity. (Tr. 680) Dr. Meyer encouraged Plaintiff instead of "persuing[sic]

disability," she should "persue[*sic*] active improvement of her overall situation" by starting physical therapy as prescribed and changing her medication regimen. (Tr. 684)

Similarly, Dr. Clark observed Plaintiff had a normal gait without any sensory or motor deficits and found that Plaintiff had no significant limitations due to her back. On November 25, 2013, Plaintiff complained of low back pain for the past two years with improvement after surgical repair until one month earlier, when the pain returned. Dr. Freidel prescribed Tramadol and Cymbalta, and when Plaintiff returned on January 2, 2014, she reported prescribed medications helping.

The undersigned concludes that the ALJ did not err in affording Dr. Parker's February 27, 2014, MSS little weight inasmuch as his opinions were inconsistent with the medical record. See Papesh, 786 F.3d at 1132 (holding that a treating physician's opinion "may have 'limited weight if it ... is inconsistent with the record'") (quoting Samons v. Astrue, 497 F.3d 813, 818 (8th Cir. 2007)).

The Court finds that the ALJ considered the factors set forth in 20 C.F.R. § 416.927(c)(2) - namely, length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization when ascribing little weight to Dr. Parker's opinions in the February 27, 2014, MSS. Further, no other examining physician in any treatment notes stated that Plaintiff was disabled or unable to work or imposed limitations on her capacity for work. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining

- 29 -

physician's failure to find disability a factor in discrediting subjective complaints). The medical records evidence some functional limitations, but not any disabling limitations, and Plaintiff reported a wide range of activities including helping her disabled mother, cooking, doing laundry, driving, walking up to a mile each day, performing daily strengthening exercises.

Thus, the ALJ did not err in giving little weight to Dr. Parker's opinions. The ALJ properly accorded Dr. Parker's opinions in the February 27, 2014, MSS little weight inasmuch as his findings were inconsistent with, and unsupported by, the evidence of record including his own treatment notes. See Davidson Astrue, 578 F.3d 838, 842 (8th Cir. 2009) (ALJ may discount a treating physician's opinion if it is not supported by the doctor's own treatment records); Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (ALJ permitted to discount medical source's opinions in MMS where limitations listed on the form stand alone and were never mentioned in numerous treatment records nor supported by objective testing or reasoning); see also Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011) (little evidentiary weight accorded to functional limitations set out in MSS check-off form because previous treatment notes did not report any significant limitations); Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010) (inconsistency between treating physician's treatment records and his functional assessment provides good reason for ALJ to discount physician's opinion). The record as a whole in this case, including the inconsistencies in Dr. Parker's treatment notes and his MSS and the effectiveness of treatment, casts doubt on her limitations. Having reviewed the record and the ALJ's reasoning, the undersigned finds the ALJ provided sufficient rationale for the weight he gave to Dr. Parker's opinions set forth in the February 27, 2014, MSS.

## VI.  Conclusion

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole.  Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above.  An ALJ's decision is not to be disturbed "'so long as the ... decision falls within the available zone of choice.  An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'"  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)).  Accordingly, the decision of the ALJ denying Plaintiff's claims for benefits should be affirmed.

**IT IS HEREBY ORDERED** that the decision of the Commissioner be **AFFIRMED**.  A separate Judgment in accordance with this Memorandum and Order is entered this same date.


Dated this 21st day of February, 2017.


*/s/ John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE